UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AFP MANUFACTURING CORPORATION,

      Plaintiff,

 – against –

AFP IMAGING CORPORATION, BIOWAVE
INNOVATIONS LLC, and R. SCOTT JONES,

      Defendants.

Civil Action No.

**COMPLAINT**

  Plaintiff AFP Manufacturing Corporation ("Manufacturing" or "Plaintiff"), by and through its undersigned counsel, hereby alleges for its Complaint against defendants AFP Imaging Corporation ("Imaging"), BioWave Innovations LLC ("BioWave"), and R. Scott Jones ("Jones" and, collectively with Imaging and BioWave, "Defendants"), as follows:

**PRELIMINARY STATEMENT**

  1. This action arises out of Defendants' egregious and fraudulent misrepresentations to Plaintiff and its principal owners, Craig and Susanna Brummer ("the "Brummers"), in connection with Plaintiff's 2016 purchase of the assets of Imaging, a New York manufacturer of x-ray film-processing equipment.

  2. Specifically, and in order to induce Plaintiff to consummate the transaction, Defendants provided the Brummers with documentation purporting to show that Imaging was generating sufficient near-term cash flow to enable the Brummers to develop the company into a platform for the sale of high-tech medical devices.

  3. In reliance on Defendants' representations, Manufacturing purchased Imaging's assets for $1 million pursuant to an Asset Purchase Agreement (the "APA") executed among Imaging, BioWave, and Manufacturing on June 17, 2016.

4.      After Manufacturing took possession on June 26, 2016, however, the Brummers quickly discovered that Defendants' representations had been false in virtually every material respect, including, but not limited to:

- Drastically understated materials costs and customer discounts, the effect of which was to reduce Manufacturing's net profitability to near zero;

- Severely damaged supplier relationships, resulting in draconian payment terms that tied up much of the company's working capital; and

- Significantly misstated inventory numbers, further impairing value and necessitating emergency re-orders of component parts and consequent delivery delays to Manufacturing's customers.

5.      To make matters even worse, Defendants' deception continued in the post-sale period, through falsified inventory accounting, stonewalling by legacy employees, and attempts to delete electronic files evidencing the fraud, all of which hindered Manufacturing's ability to detect and remedy the many problems plaguing the business.

6.      As a predictable, and intended, consequence of this campaign of fraud, Manufacturing has seen the value of its investment destroyed.

7.      Accordingly, Plaintiff now brings this action seeking monetary damages of at least $1.85 million, plus its attorneys' fees, for (a) breach of contract, (b) fraudulent misrepresentation and (c) unjust enrichment.

## THE PARTIES

8.      Manufacturing is a Georgia corporation with its principal place of business at 685 Dividend Drive, Suite 250, Peachtree City, GA 30269.

9.      Upon information and belief, Imaging is a New York corporation with its principal place of business at 185 Kisco Avenue, Mt. Kisco, NY 10549.

10.     Upon information and belief, BioWave is a Connecticut corporation with its principal place of business at 274 Ridgefield Road, Wilton, CT 06897.

11.     Upon information and belief, Jones is a citizen and resident of Connecticut.

## JURISDICTION AND VENUE

12.     Jurisdiction of this matter is vested in this Court pursuant to 28 U.S.C. § 1332(a), because there is complete diversity between Plaintiff and all Defendants and the amount in controversy exceeds $75,000.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the action occurred in this District.

## FACTUAL BACKGROUND

### I.     The Brummers Seek to Purchase Imaging

14.      Imaging was founded in 1978 as a manufacturer of x-ray film processing equipment for medical, dental, veterinary, and industrial uses.

15.     In early 2016, the Brummers entered into negotiations with Jones – who is Imaging's CEO and the principal member of Imaging's majority owner, BioWave – to purchase virtually all of Imaging's assets.

16.     By 2016, digital x-ray technology was replacing the use of film worldwide, rapidly rendering Imaging's primary products obsolete.

17.     Accordingly, Imaging's principal value to an acquirer lay in its ability to generate cash flow in the near term, in order to fund operations while the company was developed into a platform for the sale of current, high-tech medical devices.

II.     **The Asset Purchase Agreement**

18.     On May 6, 2016, after preliminary discussions with Defendants, the Brummers incorporated Manufacturing to serve as the acquirer of the Imaging assets.

19.     On June 10, 2016, the parties executed an Asset Purchase Agreement ("APA") among Manufacturing, as buyer, and Imaging and BioWave, as sellers.  The APA provided that Manufacturing would purchase Imaging's assets[1] effective June 27, 2016, for $1 million, in the form of $850,000 cash at closing and a promissory note for $150,000 payable to Imaging over ten years, with payments to begin 24 months after closing.

20.     The APA entitled Manufacturing to perform a due-diligence review before the sale took effect, including but not limited to:

- Imaging's financial documents and tax returns;

- Complete listings and valuations of Imaging's fixed assets and inventory;

- Imaging's supplier and customer invoices;

- Imaging's labor input costs; and

- Imaging's aged accounts payable and receivable.

21.     In the course of the due diligence the Brummers reviewed, among other things, Imaging's balance sheets, income statements, aging statements for accounts payable and receivable, tax filings, and – critically – data purporting to detail Imaging's materials costs, pricing practices, inventory holdings, and other key financial information, which Jones claimed to have drawn directly from the company's internal QuickBooks database.

22.     In the APA, Imaging and BioWave provided covenants, representations and

---

[1]     The APA carved out certain assets, such as a pending litigation claim and certain accounts receivable, which Imaging retained following the sale.  Those assets are not at issue in this action.

warranties that, *inter alia*:

a.  "All information, documents and copies of documents provided to Purchaser pursuant hereto, including those provided in connection with Purchaser's due diligence request, are, to the best of Seller's knowledge and ability to reasonably construct proforma [sic] financials, true, complete and accurate in all material respects";

b.  "All Seller financial statements provided or to be provided to Purchaser in connection with this transaction were prepared consistently from period to period and fairly present, to the best of Seller's knowledge, the financial position and results of operations of Seller's Processor Business";

c.  "The Purchased Assets include all assets, properties, contracts, permits or other items that are of material importance to the ongoing operation of Seller's Processor Business"; and

d.  "Until the Closing or earlier termination of the [APA], except with the Purchaser's written consent, Seller will conduct its business only in the ordinary course . . . , and will not . . . enter into or assume any contractual commitments other than in the ordinary course of business."

23.    Defendants also agreed that Imaging would "cause its corporate name to change within 180 days of closing, or such time as reasonably practicable thereafter, so that it will no longer contain the name 'AFP Imaging' or anything substantially similar."

24.    The APA also entitles the prevailing party to recover its attorneys' fees in any litigation arising from or relating to the APA.

25.    In reliance on the documents, information, covenants, representations, and warranties provided by Defendants, Manufacturing completed the purchase and took possession of the Imaging assets on June 27, 2016, financing the cash portion of the purchase price by taking out an $850,000 Wells Fargo veterans' loan backed by the U.S. Small Business Administration ("SBA").

### III.   Defendants' Fraudulent Misrepresentations

26.   During the sale process, Defendants provided the Brummers with extensive financial documentation purporting to show that Imaging was still generating enough sales and profit to serve as a viable platform for the introduction of a new generation of high-tech products.

27.   As detailed below, however, the documentation provided by Defendants was knowingly and intentionally false in multiple respects so as to induce Plaintiff to enter into the APA.

### A.   Drastically Understated Materials Costs

28.   In the course of due diligence, Defendants represented that Imaging's Materials Cost of Goods Sold ("Materials COGS") – a crucial determinant of profitability – amounted to 19.4% of its gross sales.

29.   After the sale closed, however, when Manufacturing tallied current materials prices and compared them to the historical data in the company's QuickBooks system, it found that the true Materials COGS was approximately 38% – almost double the percentage quoted by Defendants, on which Manufacturing had relied in purchasing the company.

30.   Not only had Defendants provided materials prices that were long out-of-date; they had omitted many necessary component parts from the Bills of Materials for the company's various products.

31.   A Bill of Materials is the complete list of parts required to build –  and tally the cost of – a product.  Without an accurate Bill of Materials, it is impossible to determine with any accuracy what the product costs to produce, much less to ensure a sufficient inventory of all of the necessary components to fill orders for the product.

32.     Soon after acquiring the company, Plaintiff notified Defendants that many of the Bills of Materials were incomplete, and Jones subsequently purported to correct them.

33.     Nearly a year after the transaction, however, the Bills of Materials are still largely inaccurate, and Manufacturing is still working to identify, price, and stock all of the omitted parts.

34.     When the costs of the missing components are taken into account, the true Materials COGS far exceeds 38%.

35.     In addition, Defendants' price quotations for some of the parts they did include in the Bills of Materials turned out to be based on massive pre-orders designed to generate bulk discounts that would look appealing in due diligence but in fact would tie up working capital in prepayment of years' worth of expenses.

36.     For example, the company's top-selling product used a component called a 7 Gallon Tank with Lid.  When Manufacturing took over the business, it found that the price data provided by Defendants for these tanks depended on an order for 480 units – even though the company needed only 100 units per year.

37.     When Manufacturing tried to reduce the order from a nearly five-year supply (480 tanks) to a six-month supply (50 tanks), the supplier replied that it would have been happy to accept a 50-unit order in the first place but, having already produced hundreds of units in reliance on the larger order, it would have to insist on delivering – and being paid for – all 480 tanks within a six-month period.

38.     Thus, Manufacturing was forced to pre-purchase nearly five years' worth of the tanks in order to continue producing the company's number one product.

39.     Upon information and belief, Defendants' action in ordering a nearly five-year supply of 7 Gallon Tanks with Lids just before the asset sale closed was not in the ordinary course of Imaging's business.

40.     The combination of higher-than-expected costs for some items, hidden costs for omitted parts, and onerous terms incurred to secure bulk discounts on yet other materials resulted in a toxic mix of drastically reduced profitability, materially impaired cash flow, and significantly decreased working capital.

## B.     Enormously Overstated Net Profits

41.     During due diligence, Defendants provided alleged pro forma income statements for 2013 through March 31, 2016, which reflected that Imaging's sales discounts to customers consistently amounted to approximately 0.5% of its annual gross sales.

42.     Three months after acquiring the company, concerned about consistent profit shortfalls, Manufacturing conducted a review of Imaging's historical QuickBooks discount data and discovered that the actual historical discount rate was approximately 23% of Imaging's annual gross sales – 46 times higher than the rate represented by Defendants, on which Manufacturing had relied in purchasing the company.

43.     These hidden customer discounts, combined with the other deceptions described herein, had the effect of reducing Manufacturing's net profitability virtually to zero.

## C.     Materially Misstated Supplier Payment Terms

44.     In the course of due diligence, Defendants provided an "Aging Summary" for accounts payable as of March 31, 2016, which stated that Imaging enjoyed generous payment terms from its suppliers.

45.     For example, the Aging Summary stated that Star-Glo, one of Imaging's three largest suppliers, allowed Imaging "90+ days" to pay each invoice.

46.     In fact, however, almost all of Imaging's suppliers – including Star-Glo – required Imaging to pay cash in advance for every order.

47.     Because the parties' non-disclosure agreement prevented the Brummers from speaking with Imaging's customers or suppliers prior to the sale, they did not learn of this material difference in payment terms until the sale was completed and Manufacturing began placing orders for parts.

48.     The cash-in-advance requirement meant that Manufacturing had to make a large, unexpected, and immediate investment of cash in inventory upon taking possession of the company, further decreasing working capital.

**D.     Materially Misstated Inventory Levels**

49.     In the course of the due diligence, Defendants provided balance sheets purportedly reflecting the value of Imaging's inventory for fiscal years 2013, 2014, and 2015, and the nine fiscal months ending March 31, 2016.

50.     Defendants also provided detailed, alleged inventory data purportedly drawn from Imaging's QuickBooks software, which appeared to support the inventory valuations reflected in the balance sheets.

51.     Upon taking control of the company, however, Manufacturing quickly discovered that Defendants had affirmatively misrepresented actual inventory levels, which were far lower than the levels set forth in Defendants' documentation.

52.     As Manufacturing attempted to fill customer orders in the weeks following the sale, it repeatedly found that required components were nearly out of stock, despite inventory documents showing ample supplies.

53.     To make matters worse, many of the parts that were in stock were obsolete, resulting in large and unexpected write-offs.

54.     The last-minute shortages necessitated repeated emergency re-orders of parts, which could take weeks to be delivered, resulting in delayed delivery of products to many of Manufacturing's customers.

## IV.     The Cover-Up

55.     Throughout the negotiations and continuing into the post-sale period, Defendants went to great lengths to conceal their deception and fraud.

### A.     The Falsified Recount

56.     Several weeks after the sale, due to repeated inventory shortfalls, Manufacturing requested, and Defendants agreed to, a new physical inventory count to be conducted jointly by the Brummers and Jones.

57.     When the four-day count was completed and the new numbers were entered into the company's Quick Books system, it appeared that the total inventory value met the minimum threshold required by the APA.

58.     Jones then requested, and the Brummers provided, an email message confirming that this APA requirement was satisfied.

59.     In the weeks that followed, however, Manufacturing's actual supplies inexplicably continued to fall short of the updated numbers generated by the physical count.

60.     The Brummers therefore asked Pat Mckechnie ("Mckechnie"), Imaging's Purchasing Manager, for the actual sheets of paper on which the physical inventory had been recorded.

61.     Mckechnie informed the Brummers that Jones had taken those handwritten papers from her and substituted a new, "cleaned up" printed document, which she had used in entering the updated inventory count into Imaging's QuickBooks system.

62.     When the Brummers asked Jones for a copy of the original count record, Jones claimed that he had misplaced it and had discarded the "cleaned up copy" once the information was entered into QuickBooks.

63.     As a result of Jones's machinations, no accurate record exists of the inventory on hand at the time of the sale.

**B.     The Data Tampering**

64.     Among the assets acquired by Manufacturing was a computer server containing historical accounting and other information about the company's operations.

65.     Following the asset sale, and despite the fact that they had no rights to the server, Defendants demanded that the server be turned over to them.

66.     In a show of good faith, Manufacturing agreed to return the server on the condition that Defendants first unlock and share the aforementioned data.

67.     Defendants represented to Manufacturing that one of the company's former employees would remotely access the server and extract the data, which would then be provided to Manufacturing.

68.     In fact, however, the Brummers discovered the former employee remotely deleting files from the server.

69.     Upon information and belief, the former employee took this action at Defendants'
behest and on their behalf, in order to conceal Defendants' fraud and wrongdoing in the course
of the asset sale.

      **C.**     **The Gag Order**

70.     During the sale negotiations, Jones informed the Brummers that he intended to
offer Imaging's employees a financial incentive to remain with the company following the sale.

71.     Only after the sale had closed did Manufacturing learn that this "incentive"
agreement included a clause providing that if <u>any</u> employee ever said anything negative about
Jones, Imaging, or the asset sale, <u>all</u> employees would forfeit the incentive payment.

72.     As intended, this provision caused most of Imaging's longstanding employees to
be extremely reluctant to disclose any information about Jones or Imaging's historical sales,
financial, inventory, or accounting practices.

73.     Under these circumstances, it is likely that the full extent of Defendants' fraud
and deception is as yet unknown.

**V.**     **The Fallout from Defendants' Fraud and Deception**

74.     The combination of soaring materials costs, vanishing net profits, and missing and
obsolete inventory has been devastating to the company:  Instead of the healthy cash flow
promised by Defendants' falsified numbers, Manufacturing struggles to break even from month
to month.

75.     To make matters worse, the unexpected need to commit significant working
capital to fund current expenses – massive inventory re-supply, advance payments to vendors
across the board, and large and unnecessary pre-purchases of component parts – has tied up
funds that would otherwise have been used to expand the company's product offerings, which, as

Defendants were aware, was the entire purpose of the sale and the only way for the company to remain viable in a rapidly changing market.

76.     As a direct result of Defendants' deceptions, the company now faces the very real prospect of insolvency and dissolution and is, moreover, saddled with the additional burden of the $850,000 SBA loan that it incurred in reliance on Defendants' fraud.

77.     Moreover, upon information and belief, Imaging continues to operate as a going concern under the same name, nearly a year after the sale, in contravention of its clear contractual obligation to cease using the AFP Imaging name.

78.     Having suffered extensive and ongoing harm due to Defendants' knowing and intentional wrongdoing, Plaintiff now seeks to recoup its monetary damages and attorneys' fees.

<u>**AS AND FOR A FIRST CAUSE OF ACTION**</u>
**(Breach of Contract as against Imaging and BioWave)**

79.     Manufacturing repeats and realleges the allegations set forth in paragraphs 1 through 78 above as if fully set forth herein.

80.     Manufacturing has performed all obligations due on its part under the APA.

81.     Imaging and BioWave had clear contractual obligations under the APA to ensure, *inter alia*, that all documents and information disclosed in due diligence were true, complete and accurate in all material respects, and that all items of material importance to the business were included in the Purchased Assets.

82.     Imaging and BioWave breached those obligations by, *inter alia*, providing materially false, incomplete, and inaccurate information throughout the due-diligence process including, but not limited to, information concerning Imaging's profits, costs, inventory, and vendor and customer payment terms.

83.     Imaging and BioWave also had a clear contractual obligation under the APA to refrain from entering into contractual commitments outside Imaging's ordinary course of business.

84.     Imaging and BioWave breached that obligation by, *inter alia*, making extraordinary pre-purchase agreements in the period immediately prior to execution of the APA.

85.     Imaging and BioWave also had a clear contractual obligation under the APA to change Imaging's name within 180 days following the sale, or a reasonable time thereafter.

86.     Imaging and BioWave are in ongoing breach of that obligation by virtue of Imaging's continuing operation as a going concern under the AFP Imaging name.

87.     As a result of Imaging's and BioWave's breaches of the APA, Manufacturing has sustained damages of at least $1.85 million.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Fraud as against all Defendants)

88.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 87 above as if fully set forth herein.

89.     In the course of negotiating the APA, Jones knowingly and intentionally made materially false and misleading misrepresentations and omissions to the Brummers and Manufacturing, in the form of documents and information that purported to detail Imaging's profits, costs, inventory levels, and vendor and client payment arrangements, among other material factors.

90.     Specifically, such materially false and misleading documents and information included, but were not limited to, (a) Imaging's balance sheets for fiscal years 2013 through 2015 and the nine fiscal months ending March 31, 2016; (b) Imaging's tax returns for the years 2013 through 2015; (c) Imaging's Accounts Payable and Receivable Aging documents; (d)

Imaging's pro forma income statements for fiscal years 2013 through 2015 and the nine fiscal months ending March 31, 2016; and (e) documents purporting to set forth data drawn from Imaging's internal QuickBooks records regarding income, profit, costs, expenses, inventory, and other material factors.

91.     Jones knowingly and deliberately provided these materially false and misleading documents and information for the purpose of inducing Manufacturing to enter into the APA.

92.     Jones knowingly and deliberately provided these materially false and misleading documents and information both on his own behalf and in his capacity as principal member of BioWave and CEO of Imaging.  Accordingly, Jones's actions and his fraudulent intent are imputed not only to Jones but also to BioWave and Imaging.

93.     In entering into the APA and paying $1 million to purchase Imaging's assets, Manufacturing reasonably relied on the materially false and misleading documents and information knowingly and deliberately provided by Jones on behalf of himself, BioWave, and Imaging.

94.     As a result of that reasonable reliance, Manufacturing has sustained damages of at least $1.85 million.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Unjust Enrichment as against all Defendants)**

95.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 94 above as if fully set forth herein.

96.     As a result of its reasonable reliance on Defendants' materially false and misleading misrepresentations and omissions, as detailed above, Manufacturing agreed to pay Defendants $1 million for the purchase of Imaging's assets.

97.     Defendants were thereby enriched at Manufacturing's expense.

98.     It is against equity and good conscience to permit Defendants to retain this unjustly obtained benefit.

99.     Thus, Manufacturing is entitled to restitution in an amount to be proven at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Attorneys' Fees as against Imaging and BioWave)

100.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 99 above as if fully set forth herein.

101.    The APA entitles the prevailing party to an award of its reasonable attorneys' fees in any litigation arising from or relating to the APA.

102.    Accordingly, Manufacturing is entitled to recover its reasonable attorneys' fees from Imaging and BioWave at the conclusion of this litigation.

### JURY TRIAL DEMAND

Manufacturing hereby demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Manufacturing respectfully prays for judgment:

A.      Awarding Manufacturing restitution and damages, including costs and fees, of at least $1.85 million;

B.      Awarding Manufacturing consequential and/or punitive damages in an amount to be determined at trial;

C.      Voiding the $150,000 promissory note provided by Manufacturing to Imaging pursuant to the APA;

D.      Awarding Manufacturing its reasonable attorneys' fees; and

E.      Any and all other relief that the Court may deem just and proper.

Dated:          White Plains, New York
                May 3, 2017

                                        **YANKWITT LLP**


                                  By:  *Dina L Hamerman*
                                       Dina L. Hamerman
                                       Sarah A. Sulkowski
                                       140 Grand Street, Suite 501
                                       White Plains, New York 10601
                                       Tel.:    (914) 686-1500
                                       Fax:     (914) 801-5930
                                       dina@yankwitt.com
                                       sarah@yankwitt.com
                                       *Attorneys for Plaintiff*