USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/6/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AFP MANUFACTURING CORPORATION,

                     Plaintiff,

    -against-

AFP IMAGING CORPORATION, BIOWAVE
INNOVATIONS, LLC, and R. SCOTT JONES,

                     Defendants.

No. 17-CV-03292 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

    Plaintiff AFP Manufacturing Corporation ("Plaintiff" or "Manufacturing") commenced this action against Defendants AFP Imaging Corporation ("Imaging"), BioWave Innovations ("BioWave") and R. Scott Jones ("Jones") (collectively the "Defendants") asserting claims sounding in breach of contract, fraud, and unjust enrichment, and seeking attorneys' fees. Before this Court is Defendants' motion to dismiss Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Facts Alleged

    The facts that follow are derived from the Complaint as well as any "documents attached to the complaint as an exhibit or incorporated in it by reference,"[1] and they are accepted as true

---

[1] While the Asset Purchase Agreement ("APA") entered into by both parties was not attached to the Complaint, the parties agree that the APA was incorporated into the Complaint by reference. (*See* Mem. of Law in Supp. of Defs.' Mot. to Dismiss at 7 (ECF No. 20); Plaintiff's Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 7 n.3 (ECF No. 22).) This Court agrees. "[D]ocuments are incorporated into the Complaint by reference when a complaint makes clear, definite and substantial reference to the documents." *Morales v. City of New York*, No. 14-CV-7253 (JGK),

1

for the purposes of this motion. *See Carlin v. Davidson Fink LLP*, 852 F.3d 207 (2d Cir. 2017). In light of the extensive facts in this case, exclusively those facts that are relevant to this motion are discussed below.

### A. The Parties

Plaintiff is a Georgia corporation whose principle owners are Craig and Susan Brummers (hereafter referred to collectively as the "Brummers") (Compl. ¶ 1, ECF No. 1.) Defendant Imaging is a Georgia Corporation founded in 1978 as a manufacturer of x-ray film processing equipment for medical, dental, veterinary, and industrial uses. (*Id.* ¶ 14.) Jones is the CEO of Imaging and a resident of Connecticut (*Id.* ¶ 11.) He is also the principal member of BioWave, which is the majority owner of Imaging and is a Connecticut corporation (*Id.* ¶¶ 10–11, 16.)

In early 2016, the Brummers entered into negotiations with Jones to purchase all of Imaging's assets and, to that end, incorporated Manufacturing to serve as the acquirer of Imaging's assets (*Id.* ¶¶ 15, 18.)

### B. The Asset Purchase Agreement

On June 10, 2016, the parties executed an Asset Purchase Agreement (hereafter, "APA") between Manufacturing, as buyer, and Imaging and BioWave, as sellers. (*Id.* ¶ 19.) The APA provided that Manufacturing would purchase Imaging's assets effective June 27, 2016 for $1 million, in the form of $850,000 cash at closing and a promissory note for $150,000 payable to Imaging over ten years, with payments to begin 24 months after closing. (*Id.*) The APA also

---

2016 WL 9651130, at *2 (S.D.N.Y Aug 9, 2016) (internal quotation marks and citations omitted). Given the frequency and specificity with which the terms of the APA are discussed in the APA, and that the APA is central to deciding whether each cause of action is pled properly, Plaintiff clearly relied on the terms of the APA in drafting its Complaint. Accordingly, this Court will consider the APA in deciding the instant motion.

entitled Manufacturing and the Brummers to execute a due diligence review before the sale took effect. (*Id.* ¶ 20.) In this review, the Brummers considered Imaging's balance sheets, income statements, aging statements for accounts payable and receivable, tax filings, and data detailing Imaging's materials costs, pricing practices, inventory holdings, and other key financial information, which Jones claimed to have taken directly from the company's internal database. (*Id.* ¶ 21.)

Additionally, Imaging and BioWave provided certain covenants, representations, and warranties in the APA, a number of which are at issue here, including:

a. All information, documents and copies of documents provided to Purchaser pursuant hereto, including those provided in connection with Purchaser's due diligence request, are, to the best of Seller's knowledge and ability to reasonably construct proforma [sic] financials, true, complete and accurate in all material respects;

b. All seller financial statements provided or to be provided to Purchaser in connection with this transaction were prepared consistently from period to period and fairly present, to the best of Seller's knowledge, the financial position and results of operations of Seller's Processor Business;

c. The Purchased Assets include all assets, properties, contracts, permits or other items that are of material importance to the ongoing operation of Seller's Processor Business; and

d. Until the Closing or earlier termination of the [APA], except with the Purchaser's written consent, Seller will conduct its business only in the ordinary course . . . and will not . . . enter into or assume any contractual commitments other than in the ordinary course of business.

(*Id.* ¶ 22.) Defendants also agreed that Imaging would "cause its corporate name to change within 180 days of closing, or such time as reasonably practicable thereafter, so that it will no longer contain the name 'AFP Imaging' or anything substantially similar." (*Id.* ¶ 23.)

Finally, the APA contains an express Georgia choice of law provision and entitles the prevailing party to recover its attorneys' fees in all litigation arising from or relating to the APA. (*Id.* ¶¶ 24, 33.)

## C. Defendants' Alleged Breaches of the APA

Manufacturing completed the purchase and took possession of Imaging's assets on June 27, 2016, financing the cash portion of the purchase price by taking out an $850,000 Wells Fargo Veterans loan backed by the U.S. Small Business Administration ("SBA"). (*Id.* ¶ 25.)

Plaintiff maintains that, after the purchase, it became aware of a number of breaches of the APA by Defendants.

### i.     False Due Diligence Documentation

First, Plaintiff contends that, in the course of the pre-purchase due diligence review, Defendants provided documentation that was intentionally false in multiple respects in order to induce Plaintiff to enter into the APA. (*Id.* ¶ 16.) For instance, Defendants represented that Imaging's Materials Cost of Goods Sold ("Materials COGS") amounted to 19.4% of its gross sales. (*Id.* ¶ 28.) After the sale closed, however, Manufacturing determined that the Materials COGS more closely approximated 38% of Imaging's gross sales. (*Id.* ¶ 29.) This discrepancy resulted from Defendants' out-of-date materials prices as well as their omission of necessary components from the "Bill of Materials," or the list enumerating the parts that were required to build, and determine the price of, Imaging's products (*Id.* ¶¶ 30–31.)

Plaintiff further alleges that Defendants' price quotations for some of the parts included in the Bill of Materials were based on massive pre-orders designed to generate bulk discounts that would look appealing in due diligence but would in fact tie up working capital (*Id.* ¶ 35.) For

example, Imaging's top-selling product required a component called a "7 Gallon Tank with Lid." (*Id.* ¶ 36.) Upon taking control of the business, Manufacturing discovered that the price data provided by Defendants for these tanks depended on an order for 480 units even though the company needed only 100 units per year. (*Id.*) When Manufacturing attempted to reduce the order from a nearly five-year supply (480 tanks) to a six-month supply (50 tanks), the supplier insisted on delivering—and being paid for—all 480 tanks within a six-month period. (*Id.* ¶ 37.)

Defendants' proforma income statements also misrepresented the sales discounts that Imaging provided its customers—estimating that they amounted to 0.5% of Imaging's annual gross sales. (*Id.* ¶ 42.) However, a review of Imaging's historical discount data conducted by Manufacturing after the sale revealed that Imaging's discount rate was approximately 23% of its annual gross sales—46 times higher than the rate previously represented by Defendants. (*Id.* ¶ 42.) Overall, these hidden consumer discounts, along with the aforementioned inconsistencies and undisclosed costs, reduced Manufacturing's net profitability to zero. (*Id.* ¶ 43.)

### ii. Materially Misstated Supplier Payment Terms

Plaintiff also contends that Defendants materially misstated supplier payment terms when they provided an "Aging Summary" for accounts payable, which stated that Imaging "enjoyed generous payment terms from its suppliers." (*Id.* ¶ 44.) For instance, while the Aging Summary stated that one of Imaging's three largest suppliers, Star-Glo, permitted Imaging "90+ days" to pay each invoice, almost all of Imaging's suppliers (including Star-Glo) required that Imaging pay for each order in advance with cash. (*Id.* ¶¶ 45–46.)

Moreover, because the parties' non-disclosure agreement barred the Brummers from speaking with Imaging's customers or suppliers before the sale, the Brummers did not discover this material discrepancy in payment terms until after the sale was completed. (*Id.* ¶ 47.)

### iii.    Materially Misstated Inventory Levels

Plaintiff further states that Defendants provided intentionally inaccurate balance sheets to Plaintiff in the course of due diligence (*Id.* ¶¶ 49–51.) After Plaintiff gained control of Defendants' company, however, it found that the actual inventory levels were much lower than the levels included in Defendants' documentation. (*Id.* ¶ 51.) Additionally, a number of the parts that were in stock were obsolete, which necessitated large write-offs. (*Id.* ¶ 54.)

### iv.    Falsified Inventory Recount

When there were repeated inventory shortfalls after the sale, the parties agreed to an inventory recount (*Id.* ¶ 56.) Following the recount, the new inventory numbers were entered into the company's online tracking system, which corroborated that the total inventory value met the minimum threshold required by the APA. (*Id.* ¶ 57.) Yet, Manufacturing's supplies continued to fall short of the updated numbers that the physical recount produced. (*Id.* ¶ 59.) Manufacturing then requested that Imaging provide it with the original document on which the physical inventory had been recorded. (*Id.* ¶ 60.) Imaging failed to produce the original document, claiming that Jones substituted it with a "cleaned-up" printed document. (*Id.* ¶ 61.) When Plaintiff asked Jones for the original record, Jones responded that he had misplaced it. (*Id.* ¶ 62.) As a result, no accurate record of the inventory exists. (*Id.* ¶ 63.)

### v. Data Tampering

Plaintiff additionally contends that Defendants engaged in data tampering following the sale. Among the assets that Manufacturing acquired as part of the sale was a computer server containing historical accounting data along with other information concerning the company's operations. (*Id.* ¶ 63.) After the sale, Defendants demanded that Plaintiff turn over the server to them even though they did not possess the rights to the server. (*Id.* ¶ 64.) Manufacturing subsequently agreed to return the server to Defendants on the condition that Defendants unlock and share the data that it contained (*Id.* ¶ 66.) Though Defendants represented to Plaintiff that a former employee of Defendants' company would access the server remotely and extract the data, which Defendants would then give to Plaintiff, this former employee instead deleted files from the server at the request of Defendants. (*Id.* ¶¶ 67–69.)

### vi. Gag Order

Finally, Plaintiff alleges that Defendants utilized a gag order to conceal their alleged fraud. (*Id.* ¶ 71.) Pursuant to that order, any employee who made negative claims about Jones, Imaging, or the asset sale would forfeit a financial incentive that they received for remaining with the company following the sale. (*Id.*)

Plaintiff contends that, as a consequence of Defendants' misrepresentations and omissions, Manufacturing faces the prospect of insolvency and dissolution, in addition to the burden of repaying the $850,000 loan that it acquired in order to effectuate the sale. (*Id.* ¶ 76.)

## II. Procedural History

Plaintiff commenced this diversity action by filing a Complaint on May 3, 2017, alleging causes of action for breach of contract against Imaging and BioWave, fraud against all

Defendants, unjust enrichment against all Defendants, and requesting attorneys' fees. (Compl. at 7, ECF No. 1.) Defendants moved to dismiss the Complaint on the grounds that Plaintiff failed to state a claim on which relief could be granted on October 06, 2017. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 20.) Plaintiff opposes Defendants' motion, maintaining that it has provided sufficient factual allegations to plausibly allege all of its claims. (Plaintiff's Mem. of Law in Opp. to Defs.' Mot. to Dismiss ("Pl.'s Opp."), ECF No. 22.) The Court now addresses each of Plaintiff's claims in turn.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted, a complaint must contain, "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing Twombly, 550 U.S. at 556). While a complaint need not include "detailed factual allegations" to survive a motion to dismiss, simple "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 5050 U.S. at 555.

When deciding a motion pursuant to Rule 12(b)(6), a court is "limited to the facts as presented within the four corners of the complaint, [the] documents attached to the complaint, or documents incorporated within the complaint by reference." *Taylor v. Vermont Dept. of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002) (citing *Hayden v. Country of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)).

**DISCUSSION**

## I.     Breach of Contract

Plaintiff contends that Defendants breached three distinct provisions of the APA. The first allegation centers on the purported obligation of Defendants under paragraphs 17(U) and 17(J) to ensure that the documents and information provided to Plaintiff in the course of pre-purchase due diligence were, "true, complete and accurate in all material respects." (Compl. ¶ 81.) The second allegation focuses on the commitment set forth in paragraph 7 of the APA to "refrain from entering into contractual commitments outside Imaging's ordinary course of business." (*Id.* ¶ 83.) And the third allegation concerns the duty, outlined in paragraph 14(b) of the APA, to "change Imaging's name within 180 days following the sale, or a reasonable time thereafter." (*Id.* ¶ 86.) Defendants maintain, however, that Plaintiff has failed to state a claim for any breach of the APA.

### A.  Choice of Law Considerations

As a preliminary matter, the Court must determine what law to apply to Plaintiff's breach of contract claims. The contractual agreement between the parties contains an express Georgia choice of law provision. (APA ¶ 33.) This provision provides that the APA "is made under, and shall be governed by and construed in accordance with, the laws of the State of Georgia." (*Id.*)

Courts in New York will typically enforce a choice-of-law clause if the chosen law bears a "reasonable relationship" to the parties in the transaction. *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624 (2006); *see also AEI Life LLC v. Lincoln Benefit Life Co.*, No. 17-CV-224, 2018 WL 2746589, at *4 (2d Cir. June 8, 2018). In order to determine whether this reasonable relationship exists, "courts have looked to the location of the following factors: the

9

parties negotiation of the agreement, performance under the agreement, including where loan payments were received; the parties' principal places of business; and the property that is the subject of the transaction." *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 148 (S.D.N.Y. 2017) (citing *Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*, No. 01-CV-5207, 2004 WL 870260, at *8 (S.D.N.Y. Apr. 23, 2004); *Astoria Fed. Mortg. Corp. v. Pellicane*, 913 N.Y.S.2d 228, 230 (2d Dep't 2010); *Gambar Enters. v. Kelly Servs., Inc.*, 418 N.Y.S.2d 818, 822 (4th Dep't 1979)). The reasonable relationship test is satisfied if one of the parties' principal places of business is in the selected forum. *Id.*

The APA satisfies the reasonable relationship test because Imaging's principal place of business is in New York. (Compl. ¶ 9); *see Madden*, 237 F. Supp. 3d at 149. Moreover, both Defendants and Plaintiff consented to an application of Georgia law to the breach of contract claim. (*See* Defs.' Mot. at 8; Pl.'s Opp. at 7.) Thus, the Court finds that the Georgia choice of law clause is valid and that Georgia law thereby governs the breach of contract claim.

### B. Applicable Law

Under Georgia law, to prove a claim for breach of contract, "a plaintiff must show: (1) a valid contract, (2) a material breach of its terms, and (3) resultant damages to the party who has the right to complain about the breached contract." *Sheely v. Bank of Am., N.A.*, No. 17-CV-14511, 2018 WL 2434462, at *3 (11th Cir. May 30, 2018). A breach of contract claim is only pled properly if it alleges that an express provision or term of the contract at issue was breached. *Burgess v. Religious Tech. Ctr., Inc.*, No. 1:13-CV-02217 (SCJ), 2014 WL 11281382, at *1 (N.D. Ga. Feb. 19, 2014), *aff'd*, 600 F. App'x 657 (11th Cir. 2015). Additionally, "every contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement." *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1307 (N.D. Ga. 2012).

### C. Application

Both parties agree that the APA is a valid contract. (Pl.'s Opp. at 17; Defs.' Reply at 7.) However, they differ over whether Defendants breached various material representations of the APA. The Court must therefore determine whether Plaintiff's factual allegations, accepted as true, allow it to draw the reasonable inference that Imaging and BioWave breached any material representations of the APA. *Ashcroft v. Iqbal*, 556 U.S. at 678. Since this determination turns on what the APA's provisions require of the parties, the Court's analysis will necessarily consist of an interpretation of the APA's language and terms.

Under Georgia law, "[c]ontract construction is a question of law for the court." *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1321 (N.D. Ga. 2014). A court may engage in contract construction on a motion to dismiss where "(1) the contract has been incorporated in the pleadings (including by reference), and (2) the sufficiency of the pleading depends on the contract's meaning." *Id.*

The "cardinal rule" of contract construction is to determine the intent of the parties at the time that they entered into the agreement. *S. Point Retail Partners, LLC v. N. Am. Properties Atlanta, Ltd.*, 304 Ga.App. 419, 421 (2010). There are three steps to the process of contract construction: (1) if the terms of the contract are unambiguous, the trial court simply enforces the contract according to its terms; (2) if the terms of the contract appear ambiguous, the existence or non-existence of an ambiguity is a question of law for the court, which applies the rules of contract construction; and (3) if the contract contains an ambiguity that the court cannot resolve by applying statutory rules of construction, a jury question arises. *Id.* The Court now considers each of Defendants' alleged breaches of the APA in turn.

### i. Accuracy of Pre-Purchase Documentation

Plaintiff first alleges that Defendants "had clear contractual obligations under the APA to ensure, *inter alia,* that all documents and information disclosed in due diligence were true, complete, and accurate in all material respects." (Compl. ¶ 81.) Plaintiff further contends that Defendants "breached those obligations by, *inter alia*, providing materially false, incomplete, and inaccurate information throughout the due diligence process including, but not limited to, information concerning Imaging's profits, costs, inventory, and vendor and customer payment terms." (*Id.* ¶ 82.)

Defendants maintain, however, that Plaintiff has failed to allege any breach of the APA, which "provides only for the accuracy of information contained within the APA itself, and provides only that the Defendants would use best efforts to prepare accurate financial statements given the complexity of valuation in [the] transaction." (Defs.' Reply at 3.) This Court disagrees and finds that Plaintiff has plausibly alleged a breach of contract claim in connection with the due diligence documentation.

First, Plaintiff has provided sufficient factual allegations to plausibly allege that Defendants materially breached an express term of the contract. The paragraph of the APA most pertinent to this dispute is 17(U), which states:

> Subject to clause 17(J), seller has made *best efforts* to prepare financial statements fairly and accurately reflecting its historical experience with the processor business as a division of the Company. *To the best of the Seller's knowledge*, all representations and warranties contained in this Agreement are true, to the extent that pro forma financials could reasonably be constructed as to the date of this Agreement, and at all time thereafter until the closing. All information, documents and copies of documents provided to Purchaser pursuant hereto, including those provided in connection with purchaser's due diligence request, are, *to the best of seller's knowledge and ability to reasonably construct proforma [sic] financials*, true, complete and accurate in all material respects.

(emphasis added) (APA ¶ 17(U).) It is instructive to read 17(U) in conjunction with 17(J), which states in relevant part:

> Seller has made *best efforts* to properly allocate the company's shared expenses in a fair and accurate manner between the Processor Business and its other business units in order to reflect its historical experience with the Processor Business in the income statements and balance sheets. Purchaser… recognizes that economies of scale can possibly be lost as a result of the carve-out nature of the transaction. All Seller financial statements provided or to be provided to Purchaser in connection with this transaction were prepared consistently from period to period and fairly present, *to the best of Seller's knowledge*, the financial position and results of operations of Seller's Processor Business.

(emphasis added) (APA ¶ 17(J).) Considered together, these provisions of the APA are plain and unambiguous; they do not require Defendants to ensure, without exception, that "all documents and information disclosed in due diligence were true, complete, and accurate." (APA ¶¶ 17(U), 17(J).) Rather, the terms recognize that these documents and information need only be "true, complete, and accurate" "to the best of the seller's knowledge and ability to reasonably construct [them]." (*Id.*) The terms do, however, require that Defendants use their "best efforts" to provide this information in a manner that is "true, complete, and accurate." (*Id.*)

Plaintiff's factual allegations, taken as true, plausibly suggest that Defendants failed to comply with provisions 17(U) and 17(J). According to Plaintiff, Defendants "drastically understated materials costs." (Compl. ¶ 4.) Defendants purportedly "represented that Imaging's Materials Cost of Goods Sold amounted to 19.4% of its gross sales" prior to Plaintiff's purchase. After the sale closed, however, Manufacturing found that the Materials Cost of Goods Sold ("Materials COGS") actually equaled *at least* 38% of Imaging's gross sales when accounting for necessary components that were omitted from the Bill of Materials prepared by Defendants. (*Id.* ¶¶ 28–29.) Moreover, Plaintiff alleges that Defendants intentionally misstated supplier payment terms, materially misstated inventory levels, and hid significant customer discounts. (*Id.* at 8–9.)

13

These allegations, if true, belie any claim that Defendants used their "best efforts" to provide accurate information to Plaintiff during the due diligence process. (Compl. ¶¶ 8–11.)

Additionally, Plaintiff satisfies the "damages" element of a breach of contract claim. Plaintiff contends that, as a consequence of Defendants' above actions, Manufacturing faces the prospect of insolvency and dissolution, in addition to the burden of repaying the $850,000 loan it acquired in order to effectuate the sale (*Id.* ¶ 76.) Specifically, Plaintiff alleges that, "the unexpected need to commit significant working capital to fund current expenses," including massive inventory re-supply, advance payments to vendors, and large and unnecessary pre-purchases of component parts, tied up funds that would otherwise have been used to expand the company's product offerings, which "was the entire purpose of the sale and the only way for the company to remain viable in a rapidly changing market." (*Id.* ¶ 75.) Plaintiff also claims that "the combination of soaring materials costs, vanishing net profits, and missing and obsolete inventory has been devastating to the company: instead of the healthy cash flow promised by Defendants' falsified numbers, Manufacturing struggles to break even from month to month" (*Id.* ¶ 74.) These allegations are sufficient to state the damages suffered by Plaintiff as a result of Defendants' alleged breach.

### ii. Contractual Commitments Outside of the Ordinary Course of Business

Additionally, Plaintiff contends that Defendants breached their "clear contractual obligation under the APA to refrain from entering into contractual commitments outside Imaging's ordinary course of business." (Compl. ¶ 83.) Defendants do not contest Plaintiff's reading of the contract, but nevertheless maintain that Plaintiff has failed to specifically allege *how* they acted outside the course of ordinary business. (Defs.' Mem of Law in Further Supp. of Mot. to Dismiss ("Defs.' Reply") at 4–5, ECF No. 24.)

This Court disagrees with Defendants and finds that Plaintiff has provided sufficient factual allegations to plausibly establish a breach of the APA. The relevant portion of the APA reads:

> Until the Closing or earlier termination of the Asset Purchase Agreement, except with the Purchaser's written consent, Seller will conduct its business only in the ordinary course, (For the avoidance of doubt, "ordinary course" will be defined as operating the Company in a manner which is consistent with historical practices), and will not dispose of any of the Assets of Seller which are related to the processor Business, or enter into or assume any contractual commitments other than in the ordinary course of business.

(APA ¶ 7.)

Plaintiff argues that Defendants breached the above provision "by, *inter alia*, making extraordinary pre-purchase agreements in the period immediately prior to execution of the APA." (*Id.* ¶ 84.) Specifically, Plaintiff alleges that Defendants entered into an unprecedented agreement to purchase 480 units of a component necessary for the production of one of Imaging's top-selling products in order to obtain bulk discount pricing that would look appealing to Plaintiff during due diligence review. (*Id.* ¶¶ 36–39.) In actuality, Imaging only required about 100 units of that component per year and the pre-purchase agreement merely acted to tie-up Plaintiff's capital. (*Id.*) Plaintiff further claims that such bulk purchases were not consistent with Imaging's historical practices. (*Id.* ¶ 39.) Given the detailed nature of the allegations in support of the contention that Defendants breached paragraph 7 of the APA, the Court finds that Plaintiff satisfies the breach element.

Plaintiff likewise satisfies the damages prong. Indeed, Plaintiff alleges that the "onerous terms incurred to secure bulk discounts on the other materials" combined with the aforementioned misrepresentations to produce "a toxic mix of drastically reduced profitability,

materially impaired cash flow, and significantly decreased working capital." (*Id.* ¶ 40.) While these are not quite "detailed factual allegations," they are far more supportive of Plaintiff's allegation that it suffered damages than "simple labels and conclusions." *Twombly*, 5050 U.S. at 555. Thus, the Court concludes that Plaintiff pleads sufficient factual content for its breach of contract claim to survive this motion to dismiss, at least with regard to Defendants' purported breach of paragraph 7 of the APA.

### iii.    Change of Name

Plaintiff next alleges that Defendants "had a clear contractual obligation under the APA to change Imaging's name within 180 days following the sale or a reasonable time thereafter." (Compl. ¶ 85.) Plaintiff contends that Defendants are in ongoing breach of that obligation by continuing to utilize the AFP Imaging name (*Id.* ¶ 86.) Defendants counter that this claim is contradicted by provisions in the APA that permit Defendants to continue to use the AFP Imaging trademark as needed in ongoing litigation. (Defs.' Mot. at 10–11.)

There are two provisions of the APA relevant to this claim. The first is paragraph 14(b), which reads: "Seller shall cause its corporate name to change within 180 days of closing, or such time as reasonably practicable thereafter, so that it will no longer contain the name 'AFP Imaging' or anything substantially similar." (APA ¶ 14(b).) The other purportedly relevant section of the APA is Paragraph 1, which provides that, "Notwithstanding any provision [in the APA] Seller shall be permitted to use the trademark 'AFP Imaging Corporation,' or any

abbreviation or substantially similar variant thereof, in furtherance of its claims in the [*AFP Imaging Corporation v. American Dicing, Inc.* action][2]." (*Id.* ¶ 1.)

Defendants concede that "the APA obligates Imaging to change its corporate name following execution of the APA." (Defs.' Reply at 4.) Yet, they maintain that they have only used the Imaging name in accordance with the exception outlined in Paragraph 1 and have, therefore, not breached any provisions of the APA. (*Id.*)[3]

However, Defendants' contention is misguided. As Plaintiff notes, nothing in the APA suggests that the provision allowing for Defendants' continued use of the AFP Imaging trademark in a pending litigation relieves Defendants of the independent responsibility to officially change Imaging's corporate name. Indeed, Defendants could have changed the corporate name while continuing to use the AFP Imaging Trademark in the pending litigation.

Moreover, as the precise contours of paragraph 14(b)'s requirements are ambiguous, Plaintiff's claim is ill-suited for resolution on a motion to dismiss. While the APA requires the seller to change its name from "AFP Imaging" within 180 days of closing, the language of paragraph 14(b) suggests that Imaging may refrain from doing so if such a change is not "reasonably practicable." (*Id.* ¶ 14(b).) Yet, the meaning of "reasonably practicable" is unclear, and the rules of construction fail to further elucidate the term—the term is neither defined more precisely nor referenced elsewhere in the APA. As a result, whether Defendants' failure to change Imaging's corporate name constitutes a breach of that provision, or whether that failure is

---

[2] This action was pending in a Westchester County Supreme Court at the time that the purchase agreement was effectuated.
[3] Regardless of Defendant's contentions to the contrary, the Court must accept as true Plaintiff's allegation that Defendants persist in using the AFP Imaging name "as an ongoing concern." (Compl. ¶ 86.); *see Iqbal*, 556 U.S. at 678.

excused because the name change is not "reasonably practicable," is a factual issue that cannot be resolved on a motion to dismiss. *See Automated Sys. Am., Inc. v. Worldplay US, Inc.*, 17-CV-0361 (AT) 2017 WL 8366141, at 3* (N.D. Ga. July 24, 2017) (noting that when contractual language remains ambiguous after applying the rules of construction, it would be improper for the Court to resolve such ambiguity on a motion to dismiss). Accordingly, Defendants' motion to dismiss Plaintiff's name-change breach of contract claim is denied.

## II.     Non-Contractual Claims

Plaintiff alleges two non-contractual claims against all defendants: fraud and unjust enrichment (Compl. at 15–16.) Specifically, Plaintiff alleges that Jones made numerous fraudulent representations in the course of negotiating the APA and that, as a result of Plaintiff's reasonable reliance on those misrepresentations, Defendants were unjustly enriched. (*Id.* ¶¶ 89, 96–97.) The Court considers each claim in turn.

### A.  Choice of Law Considerations

Where, as here, jurisdiction is grounded in diversity, a federal district court "generally applies the decisional law of the state in which its sits, including the forum state's choice-of-law rules." *Loreley Fin. (Jersey) No. 3 Ltd. V. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015). Under New York law, in deciding whether to engage in a choice of law analysis for a particular claim, it is first necessary to determine if there as an actual conflict between New York law and other relevant law. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). If there is no conflict, New York law controls. *Id.* Yet, if a conflict exists, the court must undertake a choice of law analysis claim by claim. *Id.*

Both parties agree that there is no conflict between New York and Georgia law for the non-contractual claims. (Def.'s Mot. at 11, 17; Pl.'s Opp. at 12, 15.) Accordingly, the Court will apply New York law to all such claims.

## B. Fraud as Against All Defendants

Defendants contend that Plaintiff has failed to state a claim for fraud because Plaintiff did not exercise appropriate due diligence. (Defs.' Mot. at 12, 16.). While the Court does not agree with Defendants' reasoning, it concurs with their conclusion.

### i. Applicable Law

In order to establish the prima facie case for fraud under New York law, the party alleging fraud must show that: "(1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance." *Wall v. CSX Transp., Inc.*, 471 F.3d 410 (2d Cir. 2006). New York courts also recognize a scienter element to fraud claims, but a plaintiff is not required to demonstrate intent to defraud to satisfy this element. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 444 (S.D.N.Y. 2012). Instead, a plaintiff may meet the scienter requirement by showing evidence of conscious misbehavior or recklessness on the part of the defendant. *Id.*

While "as a general matter under New York law, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract . . . not every fraud claim is foreclosed in an action also involving a contract." *Wall*, 471 F.3d at 416. A plaintiff may properly plead a fraud claim alongside a breach of contract claim if it can show: "(1) a legal duty separate from the duty to perform under the contract; or (2) fraudulent misrepresentation

collateral or extraneous to the contract; or (3) that special damages are caused by the misrepresentation and [are] unrecoverable as contract damages." *Mohegan Lake Motors, Inc. v. Maoli*, No. 16-CV-06717 (NSR), 2017 WL 6335905, at *5 (S.D.N.Y. Dec. 7, 2017) (internal quotation marks omitted) (quoting *Bridgestone/Firestone, Inc. v. Recover Credits Sycs., Inc.*, 98 F.3d 1, 20 (2d Cir. 1996)). Moreover, "New York law distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." *Wild Bunch, SA v. Vendian Entm't, LLC*, 256 F. Supp. 3d 497, 505 (S.D.N.Y. 2017).

However, "no action for fraud [can stand] when the only fraud charged relates to breach of a contract." *Id.* at 5 (quoting *Washington v. Kellwood Co.*, No. 05-CV-10034 (DAB), 2009 WL 855652, at *3 (S.D.N.Y. Mar. 24, 2009)); *see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162 (S.D.N.Y. 2011) ("Under New York law, a fraud claim is precluded as redundant of a breach of contract claim if it arises out of the same facts as the contract claim.").

### ii.    Application

Plaintiff's fraud claim is, in essence, a restatement of its breach of contract claim. *See Wall*, 471 F.3d at 416. Plaintiff bases both its first allegation for breach of contract and its fraud claim on the proposition that Defendants were obligated under the APA to ensure that all documents and information disclosed in due diligence were true, complete, and accurate and that Defendants breached those obligations by providing materially false, incomplete, and inaccurate information during the due diligence process. (Compl. ¶¶ 81–82, 89.) The breach of contract claim and the fraud claim are, thus, based on the same facts, which indicates that they are

duplicative of one another. *See Underdog Trucking LLC, Reggie Anders v. Verizon Svs. Corp*,
No. 09-CV-8919 (DLC), 2010 WL 2900048, at *6 (S.D.N.Y. Jul 20, 2010) ("Claims are defined
as duplicative even if they are "not identical [but] are based on the same facts."); *see also Oliver
Wyman, Inc. v. Eielson*, No. 15-CV-5305 (RJS), 2016 WL 5339549, at *6 (S.D.N.Y. Sept. 22,
2016) ("[W]here courts have found viable fraud claims based on fraudulent misrepresentation,
the statements concerned matters separate and distinct from *the subject matter of the contract*.")
(citing *E. Cont'l Min. & Dev. Ltd. v. Signet Grp. LLC*, No. 13-CV-1930 (KBF), 2013 WL
6503526, at *6 (S.D.N.Y. Dec. 9, 2013)). The duplicative quality of the claims is only
highlighted by the fact that Plaintiff declines to alter the language of the allegations to any
meaningful degree. In each contention, Plaintiff states that the misrepresentations relate to
"documents and information" that concern "Imaging's profits, costs, inventory levels, and
customer payment terms" ("customer payment terms" is changed to "client payment
arrangements" for the purposes of the fraud claim). (Compl. ¶¶ 81–82, 89.)

The Court, therefore, dismisses Plaintiff's fraud claim. *See RGH Liquidating Tr. v.
Deloitte & Touche LLP*, 851 N.Y.S.2d 31 (2008) (fraud claims were duplicative of a breach of
contract claim, warranting dismissal, where the fraud claims were based on alleged fraudulent
misrepresentations related to Defendants' contractual obligations to conduct audits of financial
statements with reasonable care). Moreover, where, as here, a fraud claim is duplicative of a
breach of contract claim, courts have deemed it "futile" to grant leave to replead the fraud claim.
*Sekisui Am. Corp. v. Hart*, No. 12-CIV-3479 (SAS), 2012 WL 5039682, at *8 (S.D.N.Y. Oct. 17,
2012) (Plaintiff cannot state a fraud claim that is collateral to its breach of contract claim)*; see
also Triad Int'l Corp. v. Cameron Indus., Inc.*, 998 N.Y.S.2d 13 (2014) (Plaintiff's purported

fraud damages were in fact contract damages). Accordingly, Plaintiff's fraud claim is dismissed, with prejudice.

### B. Unjust Enrichment in the Alternative as Against All Defendants

Since Plaintiff's unjust enrichment claim is similarly duplicative of its breach of contract claim, the Court also dismisses Plaintiff's unjust enrichment claim.

### i. Applicable Law

Under New York law, the existence of a valid contract typically bars recovery based on the quasi-contract theory of unjust enrichment. *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448 (S.D.N.Y. 2016). However, an unjust enrichment claim may survive a motion to dismiss where the plaintiff challenges the contract's validity. *Id.* A plaintiff may also plead unjust enrichment in the alternative to its other claims. *Burton v. Iyogi, Inc.*, 13-CV-6926, 2015 WL 4385665, at *11 (S.D.N.Y. Mar. 16, 2015). Yet, a claim for unjust enrichment will not survive a motion to dismiss unless a plaintiff explains how the claim is not simply duplicative of its other claims. *Ebin v. Kangadis Food Inc.*, 13–CV–2311, 2013 WL 6504547, at *7 (S.D.N.Y. Dec. 11, 2013). It follows that "where there is a valid and enforceable contract between the parties, and the subject matter of the unjust enrichment claim is covered by the contract" a court must dismiss the unjust enrichment claim. *ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*, 27 F. Supp. 3d 494 (S.D.N.Y. 2014).

### ii. Application

In the present action, Plaintiff's unjust enrichment claim is duplicative of its breach of contract claims, and is thus dismissed. *See Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014) ("When a matter is controlled by contract, a plaintiff has no valid claim for

unjust enrichment under New York law."); *see also Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F. Supp. 3d 467, 483 (S.D.N.Y. 2014) ("Unjust enrichment is available as a cause of action only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.") (citing *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d at 790 (2012)). In support of its unjust enrichment claim, Plaintiff states that, "as a result of its reasonable reliance on Defendants' materially false and misleading misrepresentations and omissions . . . [m]anufacturing agreed to pay Defendants $1 million for the purchase of Imaging's assets," and that "[d]efendants were thereby enriched at Manufacturing's expense." (Compl. ¶¶ 96–97.)

Both parties agree, however, that the contract is valid. (Pl.'s Opp. at 17; Defs.' Reply at 7.) Moreover, because the APA specifies the type and content of the representations that Defendants were required to provide Plaintiff in the course of due diligence, the subject matter of the unjust enrichment claim is covered by the contract. (*See* APA ¶ 17(J).) Since the only evidence Plaintiff offers in support its unjust enrichment claim is a restatement of the evidence that it provided in furtherance of its breach of contract claim, Plaintiff's unjust enrichment claim is duplicative of its breach of contract claim. Accordingly, Plaintiff's unjust enrichment claim is dismissed, with prejudice.[4]

---

[4] Though Plaintiff pleads its unjust enrichment claim in the alternative to its breach of contract claim, this does not protect its unjust enrichment claim from dismissal. Courts in this District distinguish between claims for unjust enrichment where the parties dispute the existence of the contract and those where parties agree that the contract exists. *Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 683 (S.D.N.Y. 2015). It is typically permissible to plead an unjust enrichment claim in the alternative if parties dispute the existence of the contract. *See Willman v. Zelman & Assocs., LLC*, No. 11-CIV-1216 (KBF), 2012 WL 811512, at *5 (S.D.N.Y. Mar. 12, 2012) ("[S]ince defendants deny that they had a contract, or owe damages, the Court is unwilling to toss out one claim when another theory might prove to be the more appropriate at a later stage . . . ."); *see also Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*, No. 14-CV-10078 (LLS), 2015 WL 4092392 (S.D.N.Y. July 6, 2015) (Plaintiff was permitted

## C. Attorneys' Fees

Defendants state, and Plaintiff does not dispute, that New York law governs Plaintiff's claim for attorneys' fees. (Defs.' Mot. at 19.) Under New York law, "counsel fees are not recoverable in an action unless specifically provided for by statute or contract." (Defs.' Mot. at 19) (citing *Fernandez v. Koretz*, 700 N.Y.S.2d 888 (N.Y. App. Div., 4th Dep't 1999)); *see also Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 241 (S.D.N.Y. 2011) ("New York follows [the] 'American Rule' on award of attorneys' fees, meaning that attorneys' fees and disbursements are incidents of litigation and that the prevailing party may not collect them from the loser unless award is authorized by agreement between the parties or by statute or court rule.").

As Plaintiff recognizes, the "APA entitles the prevailing party to an award of its reasonable attorneys' fees in any litigation arising from or relating to the APA." (*See* Compl. ¶¶ 101–102); (APA ¶ 33) ("In the event of any litigation between the parties arising from or relating to this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees"). Defendants do not contest that the APA contains this provision. (Defs.' Opp. at 19.) Instead, they argue that "dismissal of the other counts will result in this claim being rendered moot, and as such, it should be dismissed together with the other counts as provided for herein." (*Id.* at 20.)

---

to plead its unjust enrichment claim in the alternative where Plaintiff stated that its unjust enrichment claim was "made in the alternative to the claim for breach of contract, to the extent that the Court might find that [Defendant] did not have contracts with [Plaintiff]."). However, courts normally dismiss unjust enrichment claims with prejudice where, as here, parties do not dispute that a contract exists. *See Verizon Servs. Corp.*, 139 F. Supp. 3d at 683; *see also Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 791 (2012) (an unjust enrichment claim that is duplicative of a breach of contract claim should be dismissed because, "if [P]laintiff's other claims are defective, an unjust enrichment claim cannot remedy the defects").

However, since the award of attorneys' fees is authorized by the APA and Plaintiff's breach of contract claim survives this motion to dismiss, Plaintiff alleges sufficient facts to state a plausible claim for relief of attorneys' fees.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's fraud claim and the unjust enrichment claim are dismissed with prejudice. Plaintiff's breach of contract claims remain.

Defendants are directed to file an answer on or before July 24, 2018. The parties are directed to appear for an initial case management and scheduling conference on July 27, 2018 at 11:45 a.m. in Courtroom 218 of the Charles L. Brieant, Jr. Courthouse, 300 Quarropas Street, White Plains, New York 10601. The parties are also directed to complete a Civil Case Discovery Plan and Scheduling Order in advance of the conference. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 20.

Dated:   July 5, 2018                        SO ORDERED:
         White Plains, New York

                                            NELSON S. ROMÁN
                                    United States District Judge